KAPRALIAN *v.* CENTRAL LIFE INS. CO. OF ILLINOIS.

1. INSURANCE—LOANS—CASH SURRENDER VALUE.

Insurer under life insurance policy is under no liability as a matter of law upon death of insured after lapse of policy for nonpayment of premiums where a valid loan against the policy is in excess of the cash surrender value, leaving no balance of latter with which to purchase extended insurance.

2. SAME—FACE AMOUNT—CASH SURRENDER VALUE.

Face amount of life insurance policy rather than that amount plus guaranteed additions *held*, proper basis for determination of cash surrender value where policy expressly provides for use of face value in such computation.

3. SAME—CONSIDERATION.

In action of assumpsit against insurer which had written a new policy for one insured in a company placed in receivership, dating of new policy back to date of original policy, issuance to man nine years older without further medical examination and special provisions to take care of loan in course of balance of term of payments *held*, sufficient consideration for making loan in excess of cash surrender value, hence excess of loan over such value is not property of insured which may be applied in payment of premiums.

4. SAME—VARYING WRITTEN INSTRUMENTS—PAROL EVIDENCE—PREMIUMS.

In action of assumpsit, written policy of life insurance and certificate of loan thereon may not be altered by parol statements that insurer loaned insured money in excess of cash surrender value to take care of subsequent premiums if unpaid by insured.

Appeal from Oakland; Rogers (Goodloe H.), J. Submitted April 15, 1936. (Docket No. 94, Calendar No. 38,867.) Decided June 11, 1936.

Assumpsit by Myreni Kapralian against Central Life Insurance Company of Illinois on a life insurance policy. Verdict and judgment for plaintiff. Defendant appeals. Reversed.

*Robert D. Heitsch,* for plaintiff.

*Patterson & Patterson* (*John M. Allen,* of counsel), for defendant.

Butzel, J. Garabed Kapralian on February 4, 1924, at the age of 44 took out a "20-year payment" life insurance policy in the Security Life Insurance Company of America, referred to herein as the Security company. He paid his premiums regularly for nine policy years. On April 18, 1932, a receiver was appointed for the company by an Illinois Federal court. On August 15, 1932, the Central Life Insurance Company of Illinois, defendant herein, entered into a certain contract of reinsurance with the receiver of the Security company in order to take care of certain of the outstanding Security policies, including that of assured. The contract, as amended, was duly approved by the court and provided that a compound interest bearing "lien equal to the full legal reserve * * * (including dividend and coupon additions and accumulations and an adequate reserve for disability and double indemnity benefits, if any)," be placed against each Security policy taken over by the Central because of the great impairment and depreciation of the assets of the Security company. Several months later an assumption certificate was sent to the assured by the Central company which included a recital of the assumption contract.

In February of 1933 an agent of defendant called upon assured at the latter's home and offered to

exchange a new policy for the old Security policy assumed by the defendant company. This policy was one designed by defendant for this special purpose and was dated back nine years to February 4, 1924, the date of the assured's original policy, and required no medical examination for proof of insurability. The agent explained that the cost of dating the policy back nine years was $342.77, but that as assured did not have any such sum available, an interest-bearing note for that amount would be accepted. The policy also provided guaranteed additions, so that in the event of assured's death within the next 10 policy years, the additions would approximate the amount of the loan plus interest, and the beneficiary would receive $1,000 or thereabouts. Assured was to pay a quarterly premium of $14.56, a sum slightly higher than that exacted under the old Security policy. In taking out this new policy, the "fund held for the policy-holders of the Security Life Insurance Company of America" by the Central company was to become a "survivorship fund," to be increased with compound interest, and to be distributed in accordance with the terms of the survivorship certificate issued along with the new policy. As it is undisputed that at the time of assured's death there had been no funds transferred to the survivorship fund, we need not discuss its effect.

Assured signed an application for the exchange of policies and also a certificate of loan stating that the Central had loaned him the sum of $342.77 which with any additional loan should be a lien on the policy until paid and that simple interest at the rate of six per cent. should be added thereto. The assured at the same time paid the quarterly premium as of February 4, 1933, which was the date of

issuance of the new policy. The premium that became due on May 4, 1933, was not paid to defendant within 31 days of the due date or at any other time.

Notwithstanding the erroneous statement of the trial judge that assured died on June 4, 1933, the parties are in accord and the record shows that assured died on June 15, 1933. This was subsequent to the lapsing of the policy through failure to pay premiums. Upon defendant's refusal to pay, plaintiff brought suit to recover on the policy. The trial judge correctly charged the jury that if there were a valid loan against the policy and it exceeded the amount of the cash surrender value, there was no liability on the policy. We, however, find there was no proper theory upon which the case should have been submitted to the jury.

The cash surrender value of the policy, in accordance with the printed tables therein set forth, was only $285 at the time of assured's death, while the certificate of lien imposed upon it was $342.77 plus interest. Plaintiff denies that the cash surrender value was only $285, and argues that there was a sufficient excess of cash surrender value over lien to keep the policy in force up to the time of assured's death. As the policy was in its tenth policy year at the time of assured's death, the face amount plus guaranteed additions brought the policy to the amount of $1,385 payable in the event of assured's death. Plaintiff contends that in computing the cash surrender value, the sum of $1,385 instead of $1,000 should be used, in which event there would be a sufficient excess of cash surrender value over indebtedness so to extend the insurance to a time subsequent to the death of assured. The policy reads, however:

"The following tables (including the cash value table) are based upon a policy whose face amount is $1,000.  If the face amount of this policy is more or less than $1,000 the amounts shown in Table No. 1 * * * will apply *pro rata.*"

On the first page of the policy, almost at its very beginning, it is stated in two places that the face amount of the policy is $1,000.  The lower court properly found, as a matter of law, that the cash surrender value of the policy should be computed in accordance with the table on the basis of a face value of $1,000.

Counsel for plaintiff ingeniously argues that the certificate of lien should not have been for more than the cash surrender value of the policy and that any excess belonged to the assured and should be applied towards payment of the premium.  The testimony, however, shows that the policy was dated back nine years so that assured had only to make payments for 11 years more in order to be entitled to a fully paid-up policy; that the policy was issued to a man at the age of 53 without further medical examination; that the policy was specially designed to take care of the loan in the event of assured's death during the next 11 policy years by adding guaranteed additions so that his beneficiary would receive a sum in addition to the full amount of $1,000 which would pay for the loan.  It was strictly a matter of written contract and there is nothing in the contract which limited the cost of procuring the policy to the amount of the cash surrender value. Neither in the negotiations leading up to the exchange was there any such statement made.  We are presented with a mass of figures tending to show the amount required by the Central company to pro-

cure the policy might have been too high, but even if plaintiff's contention is correct, it does not change the written agreement. Plaintiff's claim that the lien did not exist in its entirety because it exceeded the cash surrender value of the policy is without merit.

Counsel for plaintiff further claims that nothing in the certificate of loan states that it was to pay for the new policy, and that as assured never received any cash from the loan, there was no consideration for the loan and it was, therefore, either a nullity or constituted an obligation on the part of the Central company to pay for premiums which assured failed to pay. Plaintiff in order to prove this point placed the beneficiary, Mrs. Kapralian, on the stand. She evidently did not understand or speak the English language. She was present during the interview between the defendant's agent and the assured, and had a similar policy affected by the same conditions. Her memory seemed very poor as to when the meeting took place, her statement being that it was at nine o'clock at night before Christmas. An interpreter, after asking her a question as to whether she took part in the conversation that evening, answered as follows:

"*A.* She says she was, and she doesn't understand what happened, what went through that night when they got through talking. She doesn't know all about—when they got done, she doesn't know all about it when they got done talking after."

Mrs. Kapralian's testimony seems to confirm the testimony of the agent. She testified:

"*Q.* Was there any talk about borrowing money on the new policy?

"*A.* He told them they could borrow any time, borrow and pay on the new policy, the agent told them."

And further:

"*Q.* Did the agent say anything to you about paying for the new policy besides giving up the old policy, $342.77?
"*A.* She said no. * * * No, she said, but after the policy was received you can borrow $340 to pay."

The most that can be adduced from Mrs. Kapralian's testimony is that she claims to have had but little understanding of the entire transaction and that the amount was only to be loaned after the new policy was issued to cover future premiums. Mrs. Kapralian's testimony is unconvincing and feeble, but we do not rely upon its weakness for a decision on this point. We have before us a written obligation of the assured which is expressly and unqualifiedly stated to constitute a lien on the policy. There is sufficient consideration for the obligation in the antedating of the policy. We will not permit the beneficiary to alter the terms of the policy and certificate of loan by parol statements that the insurance company loaned assured the money to take care of subsequent premiums if unpaid by assured. *Bowen* v. *Prudential Ins. Co. of America,* 178 Mich. 63 (51 L. R. A. [N. S.] 587). Counsel fails to realize that this is not an action for damages for fraud, or for rescission or reformation.

Plaintiff's presentation of a bewildering mass of figures to prove that the old Security policy was more favorable to assured than the new one is beside the point. Plaintiff has gone at length into

the question of whether a policy may be forfeited for failure to repay a loan. In the instant case, we are only concerned with the failure to pay premiums.

A failure to pay premiums on a policy where the charge of indebtedness against the cash value leaves no balance of cash value with which to purchase extended insurance, and where death takes place after the period of grace, results in nonliability on the part of the insurance company. *Balyeat* v. *American National Ins. Co.,* 274 Mich. 694. The trial court should have directed a verdict in favor of defendant in accordance with the motion made.

The judgment in favor of plaintiff is reversed, with costs to defendant and without a new trial.

North, C. J., and Fead, Wiest, Bushnell, Edward M. Sharpe, and Toy, JJ., concurred. Potter, J., took no part in this decision.